UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO:
21-cv-11841-ADB

IN THE MATTER OF
RYAN DENVER AS OWNER OFM/V
MAKE IT GO AWAY,
FOR EXONERATION FROM OR
LIMITATION OF LIABILITY

IN
ADMIRALTY

ARISTIDE LEX, TORY GOVAN and WILFRED JULCE, SPECIAL PERS. REP,
ESTATE OF JEANICA JULCE'S MEMORANDUM OF LAW IS SUPPORT OF THEIR
JOINT MOTION TO LIFT STAY FOR LIMITED PURPOSE OF ADJUDICATING
MOTION FOR JUDGMENT ON THE PLEADINGS

Now come the Claimants Aristide Lex, Tory Govan, and Wilifred Julce, Spc. Pers. Rep,

Estate of Jeanica Julce (collectively "Claimants") and submit the following facts and authorities

in support of their joint Motion to Lift Stay for Limited Purpose of Adjudicating their Joint

Motion for Judgment on the Pleadings.

BACKGROUND and FACTS

This action arises out of the allision of a pleasure vessel named MAKE IT GO AWAY

(hereafter "the Vessel") with the fixed and stationary navigational aid "Daymarker #5" on off

Castle Island in Boston Harbor on July 17, 2021 (hereafter "the Casualty"). ECF #1, ¶¶2,3,6. At

the time, Plaintiff Denver was the owner and operator of the vessel which was homeported in

Boston, Massachusetts. ECF 1, ¶3. The impact of the vessel with Daymarker #5 caused all eight

persons on board to enter the water, including the Plaintiff and the Claimants. ECF 1, ¶15. One

of the passengers died. ECF 1, ¶15, 22, 26.

Plaintiff filed this limitation action pursuant to 46 U.S.C. § 30511 and § 30502 (2006)

(hereafter "the Act") on November 12, 2021 seeking exoneration from or limitation of liability

arising out of the casualty and the Court issued the usual Order under Rule F enjoining all other proceedings on November 16, 2021, ECF 4.  Claimants thereafter moved pursuant to Rule 12(b)(6) to dismiss on the grounds that the Complaint firmly establishes Plaintiff's privity and knowledge with a focus on the "Owner At the Helm" rule.  ECF 6.  This Honorable Court denied the motion on the grounds that Plaintiff's factual allegations about proper operation, inability to see the marker and the presence of an unidentified vessel, were "sufficient, if only barely, to nudge Plaintiff's claim of reasonableness across the line from conceivable to plausible."  ECF 37.

On November 28, 2022, Ullman, J., denied Denver's first motion to dismiss the criminal indictment filed against him arising out of the allision.  Ex. A.

In light of subsequent authority and the Homeport Doctrine, Claimants were prepared to file a Motion to Dismiss on the Pleadings under Rule 12(c) when, on February 2, 2023, the Court entered its Order staying the action until the criminal proceedings against limitation Plaintiff Ryan Denver have resolved.  ECF 44.  That order gave the parties the opportunity to file a motion to lift the stay if they believe such a motion to be warranted. *Id*.  Thereafter, February 7, 2023, Ullman, J., denied Denver's second motion to dismiss the criminal indictment.  Ex. B. The claimants believe that a lifting of the stay is warranted by the merits of the proposed motion on the pleadings; the fact that the criminal proceedings are ongoing; and their need to pursue without further delay their constitutionally protected right to a jury trial.

## ARGUMENT

### THE MERITS OF THE PROPOSED MOTION COMPEL LIFTING THE STAY

A.  STANDARD APPLICABLE TO 12(c) MOTIONS ON THE PLEADINGS

The proposed motion would be determined on a standard basing its survival on plaintiff's

ability to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 547 (2007). Because a motion for judgment on the pleadings

"calls for an assessment of the merits of the case at an embryonic stage," the Court "view[s] the

facts contained in the pleadings in the light most favorable to the nonmovant and draw[s] all

reasonable inferences therefrom" in their favor. *Pérez-Acevedo v. Rivero-Cubano*, 520 F.3d 26,

29 (1st Cir. 2008) (quotations omitted). Unlike a Rule 12(b) motion, on a Rule 12(c) motion, the

Court considers as true those assertions in the pleadings, including the answer, that have not been

denied and do not conflict with the assertions in the complaint. *Santiago v. Bloise*, 741 F. Supp.

2d 357, 360 (D. Mass. 2010). See also *Aponte-Torres v. University of Puerto Rico*, 445 F.3d 50,

54-55 (1st Cir. 2006). In addition, "[t]he court may supplement the facts contained in the

pleadings by considering documents fairly incorporated therein and facts susceptible to judicial

notice." *R.G. Fin. Corp. v. Vergara-Nuñez*, 446 F.3d 178, 182 (1st Cir. 2006); *Haley v. City of

Bos.*, 657 F.3d 39, 46 (1st Cir. 2011). That decision makes clear that the court also takes into

consideration "documents incorporated by reference into the complaint, matters of public record,

and facts susceptible to judicial notice." These would include (1) the two decisions of Judge

Ullman in the criminal action, (2) pleadings in the companion actions of *Markel v. Denver* (22-

cv-11150-ADB) and *AIG Property Casualty Co. v. Rosenthal*, C.A. (No. 1:22-cv-11401-ADB)

and (3) Enactment of the National Defense Authorization Act Restricting Application of the

Limitation of Liability Act.[1]

---

[1] On December 23, 2022, H.R.7776 - James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 became public law. It removes from the protection of LOLA certain Small Passenger Vessels and was enacted to allow claimants to be fully compensated for damages arising from small vessel casualties. While not directly dealing with vessels like MAKE IT GO AWAY, and to be applied prospectively only, the legislation stands as an expression of the unfairness arising out of LOLA matters and the problems which can arise through its blind application.

B.  THE HOMEPORT DOCTRINE

The Home Port Doctrine "has been established in order to deny limitation of liability in instances where the vessel seeking limitation, the owner and the casualty all occur in local waters of the home port." *Amador v. Torres* (*In re Torres*), Omnibus Opinion and Order, Civil No. 17-2050 (DRD), 27 (D.P.R. Mar. 31, 2021). In defining the doctrine, the Court noted that:

> According to the Eastern District of New York, the nature of a voyage in a home port "suggests the opportunity to more detailed control by the owner and the responsibility of its executives, who were virtually on the scene, to supervise the vessel's ongoing seaworthiness more closely than if the vessel were in high seas."

Id. at 27.  It cited *Haney v. Miller's Launch, Inc.*, 773 F. Supp. 2d 280, 290 (E.D.N.Y. 2010) and *In re J.R. Nicholls, LLC*, 2012 WL 1802588, Texas (Houston Div.) (holding that when a vessel is operated within the home port on the time of the incident, and "the captain and crew were in daily, close contact with ownership and supervisory personnel," it is not the instance "[w]here the purpose of the Act would be served by a limitation of liability."). Id. at 27.

Denver starts his Limitation Petition, "as owner of the M/V MAKE IT GO AWAY, USCG No. 1308302 (hereinafter referred to as the "Vessel")".  It is undisputed that that vessel's homeport is Boston, Massachusetts.  It is also undisputed that the vessel was operated within the Port of Boston and that that is where the casualty occurred.  Plaintiff himself resides in Boston. The cited cases can be distinguished from this matter only by the fact that the vessel's involved were operated by captains and crews under the remote supervision of the owners.  Obviously, in this case, the owner was operating the vessel at the time of the allision and actually (not "virtually") on scene making application of the doctrine and its supporting rationale all the more relevant.  Given that the LOLA is not applicable to vessels being remotely supervised if operating within its homeport it cannot be applicable to one being directly supervised while being operated by its owner in its homeport.

4

## C.  NO NEED TO DETERMINE MERITS OF COLLISION LIABILITY

*In Re Amador, id.* provides a further basis for a finding that the LOLA is inapplicable in

this circumstance.  In denying Claimants' initial motion, the Court also remarked on claimant's

failure to cite to specific statutory violations in its argument regarding the Pennsylvania Rule.

Claimants respectfully submit that *Amador* stands for the proposition that final determination of

the relative fault and negligence of vessels and proof of statutory violation are not necessary in

circumstances such as this:

> As there are genuine issues of material facts regarding violation of rules or
> regulations related to the proper lighting and navigations of the vessels, the Court
> deems that the standard is not met to activate the presumption of the Pennsylvania
> Rule. Nonetheless, the Court deems that said presumption was not required to be
> activated in order to deny exoneration or limitation of liability as to the owner of
> LA NENA . . .

Id. at 34.  The *Amador* court went on to say that

> . . . regardless of potential violations incurred by the ANDREA GABRIELA
> during the subject voyage. Determining that Mr. García-Torres as owner of LA
> NENA II, is not subject to exoneration or limitation of liability does not require
> an analysis as to the collision and ANDREA GABRIELA's violations at this time.
> Such determinations are left for the sound discretion of the Jury.

Id. at 35.  Although Claimants will not be arguing, should their motion be allowed, that dismissal

can be based upon a final determination of fault at this stage, they do in good faith believe that

they can demonstrate under the Rule 12(c) standard that plaintiff is not entitled to the benefit of

the LOLA. While he may argue that the now-identified Rosenthal vessel had a higher percentage

of fault than himself, that argument has no bearing on his own inability to establish lack of

privity or knowledge. Although claimants argued this progression initially in its somewhat

similar motion to dismiss, ECF 37, they did not then have the benefit of the *Amador* court's

reasoning and logic.  They also did not have the benefit of the facts to be derived from the

pleadings which have since come down in the criminal and companion actions. These, Claimants

submit, will provide the necessary facts to push Plaintiff's reasonableness claim back over the conceivable/plausible divide, thereby establishing his non-entitlement to the LOLA.

Claimants respectfully submit that, as demonstrated above and as would be expanded upon in the proposed motion, the Limitation Complaint before the Court does not warrant either further discovery or trial on the issue of entitlement to limit because plaintiff's claim under the LOLA (1) is contrary to the Homeport Doctrine and (2) does not require full adjudication as to Plaintiff's degree of fault or the liability of 3rd parties at this time.

WHEREFORE, Claimants submit that a lifting of the stay of proceedings is warranted and move this Honorable Court to Lift the Stay of this action as imposed on February 2, 2023 (ECF 44) so as to allow the filing of a Motion for Judgment on the Pleadings.[2]  Alternatively, the Claimants ask the Court to exercise its discretion by lifting the injunction imposed at ECF 4 so as to allow them to proceed with trial before a jury in either this court or a court of the Commonwealth of Massachusetts upon the filing of acceptable stipulations preserving this court's right to determine limitation issues.

---

[2] Claimants make this Motion without prejudice to their rights to subsequently and as necessary ask this Honorable Court to enter an Order reliving them from the injunctive stay, staying this action pursuant to Rule F and allowing them to proceed to pursue their constitutional rights and rights at law to proceed with a jury trial in the Suffolk County Superior Court.

February 24, 2023

ARISTIDE LEX
By His Attorneys

*/s/ William B. O'Leary*
William B. O'Leary
B.B.O. No. 378575
The O'Leary Law Firm
63 Shore Road Suite #25
Winchester, MA 01890
P. (781) 729.5400
F. (781) 729-5620
E. bill@tuglaw.com

*/s/Dennis Phillips*
Dennis Phillips
B.B.O. No. 398320
63 Shore Road-Suite 23
Winchester, MA 01890
P. (781) 789-3997
E. dppesq1@comcast.net

WILFRED JULCE AS SPECIAL
PERSONAL REP., ESTATE OF
JEANICA JULCE

*/s /Douglas K. Sheff*
Douglas K. Sheff
B.B.O. No. 544072

*/s/ Peter Chandler*
Peter Chandler
B.B.O. No. 703139
Sheff Law Offices, P.C.
The Daniel Webster Suite
10 Tremont Street
Boston, MA 02108
P. (617) 227-7000
F. (617) 227-8833
E. dsheff@shefflaw.com
E. pchandler@shefflaw.com

TORY GOVAN
By Her Attorney

*/s/ Stesha A. Emmanuel*
Stesha A. Emmanuel
B.B.O. No. 682293
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
P. (617) 449-6511
E. semmanuel@mccarter.com

*/s/ Siobhan Tolan*
Siobhan Tolan
B.B.O. No. 687101
McCarter & English, LLP
265 Franklin Street
Boston, MA 02110
P. (617) 449-6511
E. stolan@mccarter.com

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated below I electronically filed the above filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties listed on the electronic service list within the CM/ECF system.

Dated at Winchester, Massachusetts this 24th day of February, 2023.

David J. Farrell , Jr.
Farrell Smith O'Connell LLP
2355 Main Street
PO Box 186
S. Chatham, MA 02659
508-432-2121
Email: dfarrell@fsofirm.com

Liam T. O'Connell
Farrell Smith O'Connell
46 Middle Street
Gloucester, MA 01930
978-309-9243
Email: loconnell@fsofirm.com

Kirby L. Aarsheim
Farrell Smith O'Connell LLP
27 Congress Street
Suite 109
Salem, MA 01970
978-744-8918
Email: kaarsheim@fsofirm.com

John B. DiSciullo
Mitchell & DeSimone
101 Arch Street
10th Floor
Boston, MA 02110
617-737-8300
Fax: 617-737-8390
Email: jdisciullo@mitchelldesimone.com

Robert W. Norton
Giarrusso, Norton, Cooley & McGlone, PC
308 Victory Road
Marina Bay
North Quincy, MA 02171
617-770-2900
Email: rnorton@gncm.net

Carolyn M. Latti
Latti & Anderson, LLP
30 – 31 Union Wharf
Boston, MA 02109
clatti@lattianderson.com

David F. Anderson
Latti & Anderson LLP
30-31 Union Wharf
Boston, MA 02109
617-523-1000
Fax: 617-523-7394
Email: danderson@lattianderson.com

Jessica G. Sullivan
Aviation, Space and Admiralty Litigation
United States Department of Justice
Civil Division, Torts Branch
P.O. Box 14271
Washington, D.C. 20044
Jessica.Sullivan@usdoj.gov

Lia Rettammel
DOJ-Civ
Torts Branch- Aviation Space & Admiralty
Three Constitution Square
175 N ST NE
Ste 8th Floor
Washington, DC 20530
202-436-5058
Email: lia.rettammel@usdoj.gov

Kevin G. Kenneally
Freeman Mathis & Gary, LLP
60 State Street, 6th Flr.
Boston, MA 02109
617-963-9680
Email: kkenneally@fmglaw.com

Paul G. Boylan
Freeman Mathis & Gary, LLP
60 State Street, 6th Flr.
Boston, MA 02109
617-963-5972
Email: pboylan@fmglaw.com

# EXHIBIT A



## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK,** *ss.*

**SUPERIOR COURT**
**CRIMINAL ACTION**
**No. 2184-CR-00670**

### COMMONWEALTH
#### vs.

### RYAN DENVER

### MEMORANDUM OF DECISION AND ORDER
### ON DEFENDANT'S MOTION TO DISMISS

The defendant, Ryan Denver ("Denver"), moved under Commonwealth v. McCarthy, 385 Mass. 160 (1982), to dismiss the Indictment charging him with three counts of assault and battery with a dangerous weapon (a boat) causing serious bodily injury; two counts of assault and battery with a dangerous weapon (a boat); and one count of involuntary manslaughter. All charges arise out of a fatal boat crash (in nautical terms an "allision") in the early morning hours of July 17, 2021, when a boat Denver was operating hit day marker 5 in Boston Harbor. The Court heard oral argument on November 17, 2022. For the below reasons, the motion is **DENIED.**

## DISCUSSION

**I.**   **The Legal Standards**

**A. *"McCarthy"* Motions**

An indictment must be dismissed if the Commonwealth failed to present sufficient evidence to support a finding of probable cause to believe defendant committed the crime charged. Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982). Although courts generally will not inquire into the "competency or sufficiency of the evidence before the grand jury,"

Commonwealth v. Robinson, 373 Mass. 591, 592 (1977), an indictment will be dismissed if no evidence of criminality was presented to the grand jury.  McCarthy, 385 Mass. at 163.

"Probable cause…is a decidedly low standard," Commonwealth v. Barbosa, 477 Mass. 658, 675 (2017), quoting Commonwealth v. Hanright, 466 Mass. 303, 311 (2013), requiring "more than mere suspicion but something less than evidence sufficient to warrant a conviction." Commonwealth v. Hason, 387 Mass. 169, 174 (1982).  "When reviewing the sufficiency of an indictment, the grand jury evidence must be viewed in the light most favorable to the Commonwealth."  Barbosa, 477 Mass. at 675.

### B. Wanton and Reckless Conduct

On Counts 1-5, the five charges of assault and battery, the Commonwealth is proceeding on a theory of wanton and reckless battery, not intentional battery.  See, e.g., Commonwealth v. Welch, 16 Mass. App. Ct. 271, 275 (1983).  On Count 6, charging involuntary manslaughter, the Commonwealth must also prove wanton or reckless conduct.  See Commonwealth v. Godin, 374 Mass. 120, 126 (1977) (involuntary manslaughter is "an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct.")  Wanton or reckless conduct is "intentional conduct….[that] involves a high degree of likelihood that substantial harm will result to another." Commonwealth v. Earle, 458 Mass. 341, 347 (2010), quoting Commonwealth v. Welansky, 316 Mass. 383, 399 (1944).  Whether conduct is wanton or reckless is determined "based either on the defendant's specific knowledge or on what a reasonable person should have known in the circumstances."  Commonwealth v. Pugh, 462 Mass. 482, 496 (2012).

### C. Serious Bodily Injury and Demonstrable Physical Injury

Counts 1-3 require the Commonwealth to prove serious bodily injury to the victim.  See G. L. c. 265, sec. 15A.  The statute defines "serious bodily injury" as "bodily injury which results in a permanent disfigurement, loss or impairment of a bodily function, limb or organ, or a substantial risk of death."  G. L. c. 265, sec. 15A(d).

Counts 4-5, alleging assault and battery with a dangerous weapon under a theory of wanton and reckless conduct, require the Commonwealth to prove demonstrable physical injury. See Welch, 16 Mass. App. Ct. at 274-276.

## II.   Application of the Legal Standards

### A. The Grand Jury Heard Sufficient Evidence of Wanton and Reckless Conduct

Denver argues that his conduct leading up to the crash was at most careless, and did not rise to the level of wanton or reckless conduct.   He also argues that each component of his alleged wanton and reckless conduct is unsupported by credible evidence before the grand jury. Applying the above-noted legal standard for a motion to dismiss, the Court disagrees.  The grand jury heard sufficient evidence of multiple factors from which, viewing the evidence in the light most favorable to the Commonwealth, the grand jury could properly have found wanton and reckless conduct.

#### 1.  Excessive speed.

Excessive speed presumably would be the most important component of the Commonwealth's evidence of wanton and reckless conduct at a trial, and Denver fiercely contests the Commonwealth's evidence of excessive speed in his motion.  While the Commonwealth's evidence would be subject to impeachment at a trial, the grand jury heard evidence sufficient to establish that, at or shortly before the crash, the boat was travelling at a

3

rate of speed within a few miles per hour of 49.2 mph.  See 10/8/21 GJ at 15-16; GJ Ex. 39.[1]  An experienced Boston Police Department Harbor Patrol Unit officer (Officer Matthews) testified that even a professional boater should not be travelling at more than 20-25 mph when approaching the City of Boston at night through Boston Harbor.  See 9/24/21 GJ at 18-20, 32.

### 2.  Alcohol consumption.

The grand jury heard extensive evidence that Denver was part of a group that consumed alcohol for roughly five hours at two different venues before boarding the boat.  See Comm. Opp. Br. at 1-2.  More specifically to Denver, a marina employee testified that, when Denver arrived at the marina, he was "flush, red-ish" and had "alcohol coming from his breath."  8/17/21 GJ at 6, 9.  Officer Matthews testified that alcohol reduces one's ability to safely operate a boat. 9/24/21 GJ at 33.

### 3.  Failure to keep hands on or immediately next to steering wheel.

A passenger on the boat testified that at times Denver left the boat's steering wheel and, while near the wheel, socialized with other passengers.  8/31/21 GJ 21, 24.

### 4.  Failure to dim cabin interior.

The grand jury heard testimony that the boat's interior was well-lighted, making it difficult to see anything outside the boat.  8/31/21 GJ at 20-21.  Officer Matthews testified that interior cabin lights should be turned off when coming back into Boston by boat at night. 9/24/21 GJ at 29.

---

[1] Grand jury testimony is referenced by date, "GJ," and page number.  "Comm. Opp. Br." refers to the Commonwealth's opposition to the motion.

### 5.  Summary of the factors.

The grand jury could properly conclude, from the evidence of the four above-noted factors, that Denver's operation of the boat created "a high degree of likelihood that substantial harm [would] result" to the boat's passengers.  Earl, 458 Mass. at 347.  Moreover, there was evidence that neither Denver nor anyone else said anything before the boat collided into day marker 5, see 8/31/21 GJ at 24, and that, at the time of the crash, the light on day marker 5 was lighting up at the correct interval. 10/8/21 GJ at 26.  Under these circumstances, the grand jury could properly infer that some combination of the four above-noted factors was responsible for Denver's failure to see day marker 5 in time to avoid a crash that killed one passenger and seriously injured others.  This evidence provided more than adequate probable cause of wanton and reckless conduct to satisfy the Commonwealth's burden on a McCarthy motion.

### B.  The Grand Jury Heard Sufficient Evidence of Serious Bodily Injury and Demonstrable Physical Injury

The grand jury heard sufficient evidence that the boat's passengers named in Counts 1-3 suffered serious bodily injury, and that the passengers named in Counts 4-5 suffered demonstrable physical injury.

With regard to Count 1, Z.M. testified that he was hospitalized and treated for a torn ACL, a fractured kneecap, and a broken arm, that he had had six surgeries on his broken arm, and that he did not have a full range of arm and hand motion or control. 8/25/21 GJ at 72-73. With regard to Count 2, A.L. testified that he suffered a shattered jaw that was broken in three places, a broken forearm, fractured ribs, a fractured shoulder blade, a collapsed lung, and multiple lost teeth. 8/17/21 at 43.  With regard to Count 3, there was testimony that M.K. was knocked unconscious by the collision. 9/21/21 GJ at 24.  It is self-evident that knocking someone unconscious in the middle of Boston Harbor creates a substantial risk of death.  See,

e.g., <u>Commonwealth</u> v. <u>Johnson</u>, 92 Mass. App. Ct. 538, 542 (2017) (reversing dismissal of indictment, finding that profuse bleeding from head resulting from being hit by beer glass was sufficient evidence of substantial risk of death).

With regard to Count 4, P.J. testified that he suffered a dislocated elbow, broken ribs, and lacerations. 9/21/21 at 27. With regard to Count 5, T.G. testified that she suffered a dislocated knee, requiring physical therapy. 8/31/21 GJ at 26-27. This testimony established demonstrable physical injury.

### CONCLUSION AND ORDER

For the above reasons, Defendant's *McCarthy* Motion to Dismiss the Indictments (Paper # 35) is **DENIED**.

November 28, 2022

Robert L. Ullmann
Justice of the Superior Court

6

# EXHIBIT B



## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, ss.**

**SUPERIOR COURT
CRIMINAL ACTION
NO. 2184CR00670**

### COMMONWEALTH

### vs.

### RYAN DENVER

### MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS THE INDICTMENT DUE TO THE COMMONWEALTH'S DESTRUCTION OF EVIDENCE

On October 26, 2021, a grand jury indicted the defendant, Ryan Denver ("Denver"), for involuntary manslaughter, three counts of assault and battery with a dangerous weapon (a boat) causing serious bodily injury, and two counts of assault and battery with a dangerous weapon (a boat). The charges arise from a boating accident in Boston Harbor on July 17, 2021, whereby Denver's boat struck a day marker; one of his passengers drowned and others were injured. Now before the Court is Denver's motion to dismiss the indictments against him, in which he argues that the Commonwealth destroyed key exculpatory evidence. Specifically, (1) police investigators were unable to retrieve data from the boat's GPS devices due to corrosion from the devices being exposed to air; and (2) on March 16, 2022, the boat was destroyed by fire. For the reasons that follow, Denver's motion to dismiss the indictments is **DENIED**. The Commonwealth is precluded, however, from introducing evidence at trial that the boat was travelling at an excessive speed.

### BACKGROUND

**I. The Accident**

In the early morning hours of July 17, 2021, Denver was operating the "Make It Go

Away," his 2021 Pursuit DC365 boat, in Boston Harbor with seven other passengers on board. Earlier that night, the group had visited two restaurants/bars in the Seaport neighborhood where members of the group had consumed alcohol. Denver took the boat to the area of Long Island, and then turned around. On the return, at approximately 2:47 a.m., the boat struck "day marker 5," an "aid to navigation" near Castle Island. The passengers were thrown about the boat. The boat then took on water and capsized. Some of the passengers climbed on top of the capsized boat, some clung to the day marker, and others ended up in the water. One of the passengers, Jeanica Julce, drowned; her body was located at approximately 10:00 a.m. on July 17, 2021.

The boat was equipped with a Forward Looking Infrared Camera ("FLIR"), two Garmin GPSMap 8600 Series chart plotters, one on the port side and one on the starboard side, a Yamaha display, and a Garmin radar unit. The boat was powered by three 300-horsepower Yamaha Outboard Engines.

At approximately 5:30 p.m. on July 17, 2021, a salvage team from a private marine and salvage recovery company righted the boat and floated it to Safe Harbor Marina Bay in Quincy. The police photographed the boat and then a private entity that hauls boats transported it to a Massachusetts Department of Transportation lot in Cohasset. There, the boat was drydocked.

Thereafter, Sergeant Christopher Ahlborg ("Sergeant Ahlborg") from the Massachusetts Environmental Police ("MEP") sought search warrants. On July 22, 2021, he obtained a search warrant for the boat and executed it on July 27, 2021. During this search, police removed the chart plotters and Yamaha Display. Sergeant Ahlborg obtained a second search warrant on July 28, 2021 for the chart plotters and Yamaha Display.

**II. Damage to and Destruction of the Boat**

While searching the boat on July 27, 2021, Sergeant Ahlborg noted that "the forward

2

[berthing] area was inaccessible due to the damage of the vessel. Attempts were made to cut fiberglass and utilize hydraulic jacks to access this area, but it was very unstable, unsafe and still inaccessible." Police took photographs and measurements of the boat.

Almost eight months later, on March 16, 2022, police decided to shrink wrap the boat. During this process, whereby a propane torch is used to shrink the plastic wrapping, the boat caught fire. The fire was unintentional. Investigators concluded that the boat was "a total loss." Sergeant Ahlborg likewise observed that the boat was "completely destroyed."

The Commonwealth did not provide Denver access to the boat before the fire despite his requests.[1] Denver's expert, Robert Schofield ("Schofield"), has averred that he cannot reach a scientific opinion about speed through standard accident reconstruction methods without the boat. If he had access to the boat, he would "carefully examine damages and calculate physical and structural dynamic responses of [the] boat to develop a descriptive model for the boat, occupants, and time-scale physics," and "measure[] and analyze[] the damage to the ... boat in order to ascertain the degree and manner at which the boat's hull struck the day marker, as well as an approximate range of speed of the boat at impact." He stated that he would have inspected:

> a. The impact point(s) on the hull, direction of travel, and specific points of initial impact and terminal rest position of arrested motion of the various structural elements from the boat's allision with the steel daymarker. Lacking the subject boat wreckage, no such physical measurements are now possible;

---

[1] On July 18, 2021, counsel for Denver contacted the Commonwealth and asked about the boat. The Commonwealth responded that counsel could not be present for the search of the boat although counsel would be given access at a later date. Denver's counsel contacted the Commonwealth on August 10, 2021. The Commonwealth again denied counsel access to the boat and the data from its search of the electronics, claiming that the boat and data were impounded. The Commonwealth also denied counsel's request to take part in any testing. On October 5, 2021, defense counsel requested "the opportunity to obtain a copy of the GPS data from the GPS device[s] on Mr. Denver's boat as well as an opportunity to conduct a non-destructive inspection of the boat." The Commonwealth did not agree to this request. Denver never filed a motion to compel access to the boat.

b. The distance/direction/extent (horizontal and vertical) of penetration(s) of the steel daymarker through the hull;

c. Whether and how that structural material buckled, bent, collapsed, or broke off, as each such failure indicates the energy of the forces (including speed) involved at the time of the allision;

d. Evidence of passenger bodily impact (fabric/cushion tears/damage as well as window glass damage, etc.) and evidence necessary to calculate boat decelerations and resulting forces of passenger impact;

e. Evidence of damage to the boat post-accident, during the salvage and recovery. This evidence is very important in this matter because the boat capsized after the allision, and drifted for several hours before salvors raised the boat using large air bags, towed the boat to a marina, lifted the boat out of the water (it was full of water and salvors employed dewatering pumps to empty it) before it was towed to the Commonwealth's storage location, lifted and placed on blocks. This is even more vital because law enforcement reportedly made cuts to the fiberglass hull and attempted to open the alleged inaccessible portion of the boat with hydraulic lifts, in and around the area of the damaged bow.

Schofield has reviewed the photographs taken before the fire, but states that they are "not sufficient ... to use to provide expert analysis about the speed at the time of impact" and are "inadequate to conduct an accident reconstruction (as well as distinguishing between accident and post-accident damage)."

### III. Data from and Destruction of the Engine Control Units ("ECU")

During execution of the search warrant on July 27, 2021, John McLaughlin ("McLaughlin") from 3A Marine, a certified Yamaha engine dealer, downloaded engine data from each of the three Yamaha ECUs.

Before the grand jury, the Commonwealth relied on print-outs of the downloaded data from the each of the three ECUs.  The data from these print-outs are snapshots (that is, a one second reading every minute)[2] of the boat's speed for the "last twenty minutes of run time" for

---

[2] McLaughlin testified before the grand jury on October 26, 2021, that the data from the print-outs are "a snapshot at a minute" of what "the engine [is] doing [at] ... that particular time."

the engine. The print-outs list engine RPMs (revolutions per minute) and throttle requests from

minute "-19" (the 19th minute before shutdown) to minute "-1" (the last minute before

shutdown). According to the print-outs, for minute "-19," the engine speed for all three engines

was 5500 RPM with a throttle request of 100. For minute "-1," the engine speed for the engines

was between 600-650 RPM with a throttle request of 0. Over these 19 minutes, the data showed

that the engines operated across a range of 600 RPMs to 5600 RPMs.[3]

The Commonwealth provided Denver with spreadsheets in .pdf format reflecting the data

it claims it downloaded from each of the three engines. The fire that destroyed the boat also

destroyed the ECUs. Denver's expert, Bryan Emond ("Emond"), was unable to perform an

independent download of the ECUs and thus, he could not confirm that McLaughlin conducted

the data retrieval correctly or fully. Emond also stated that the ECU data cannot be used by itself

to validly determine the speed of the engine or the boat. Specifically,

> The 19 data points from the data logger represent instantaneous readings or
> snapshots of the engine parameters. The ECM [Engine Control Module] reads
> engine data many time[s] a second, so this snapshot only represents the status of
> the engine for a fraction of a second. The data points are separated by a minute.
> Therefore, the values recorded at each data point do not represent what the engine
> is doing during the nearly … entire minute between these data points. The engine
> may be turning slower or faster. It is also possible for the data logger to capture
> data as the engine is in transition from one speed to another.[4]

---

[3] Sergeant Ahlborg testified before the grand jury on October 8, 2021 that the engine RPM data
for the "19th minute is the final minute and the minus 1 is the first minute," and that at the
final/19th minute the engines were running at 5500 rpms. He also testified that this model boat
functioning at 5500 RPMs would have a speed of "49.2 miles per hour." Sergeant Ahlborg
testified incorrectly because minus 19 is actually the first minute the motor ran and minus 1 is
the final minute the motor ran. McLaughlin testified on October 26, 2021 that the way Sergeant
Ahlborg interpreted the download data was incorrect.

[4] The Commonwealth's expert stated that it was not able to reach conclusions about the boat's
speed with the information originally given to it by the Commonwealth, which included the ECU
data. Specifically, at a hearing before the court (Ames, J.) on April 19, 2022, counsel for the
Commonwealth acknowledged that what the Commonwealth had provided to its expert was a
video from a FLIR camera located at MassPort's Conley Terminal, photos of damage to the boat,
"as well as the RPMs." The Commonwealth stated: "Based upon the video, [the expert] thought

**IV. Chart Plotters and Yamaha Display**

On July 30, 2021, police sent the chart plotters and Yamaha Display to the United States

Coast Guard's (USCG) Digital Forensics Laboratory in Boston.  Despite attempts to extract data,

"[d]ue to the condition of the devices, which were heavily corroded from the extended

submersion, subsequent drying and exposure to air, no data was able to be extracted."[5]  Sergeant

Ahlborg stated that he and Special Agent Mark Jenkins ("Jenkins") from the USCG, took the

devices "apart, cleaned them, dried them out, [and] clean[ed] them with alcohol," but found

"[s]ignificant corrosion on the motherboards of each unit which ultimately made them

unreadable."  Sergeant Ahlborg testified before the grand jury that if they had not been corroded,

the chart plotters "likely would have shown the GPS path with specific speeds" and "would have

given speed, specific reference points."

The Commonwealth did not inform Denver's counsel until October 18, 2021 that it had

been unable to retrieve data from the GPS devices due to water damage.  On November 17,

2022, the Commonwealth gave Denver a one-page "Supplemental Narrative for Sergeant

Christopher Ahlborg," which stated, in relevant part:

> At [the time the boat was brought to Cohasset], I did not fully realize the exigency
> to remove[] and re-submerge the electronics to preserve the data.  This action
> proved to be a mistake, as the electronics, which were compromised in the
> collision had been exposed to oxygen until July 27, 2021, when the search
> warrant was executed.  This saltwater exposure and subsequent oxygen exposure
> allowed the metal components to corrode.  Corrosion is a breakdown of metal
> materials especially when exposed to water and then air (oxygen).  Saltwater
> causes corrosion of metal components at a significantly higher rate than fresh
> water.  While steps were taken on July 27, 2021, to re-submerge the electronics
> once they were removed, it proved to be too late.

they initially would be able to approximate it or give a speed based on the video and the damage.
Due to the quality of the video, they're not able to do that ...."
[5] Before the grand jury on October 8, 2021, Sergeant Ahlborg stated that when they removed the
devices from the boat, there was water inside of them, which is why they needed to resubmerge
them in water.

The three electronic components were transferred from MEP evidence to the USCG CGIS at Sector Boston for a forensic examination. They were dropped off on July 29, 2021 and signed for by Trooper Kevin Hart, who is assigned to that office. SA Mark Jenkins began the process of drying out and examining the electronics. On August 2, 2021, I went to the CGIS office to observe the data extraction process. Jenkins was unable to complete the examination due to the units still being wet and extremely corroded. Over the next few weeks Jenkins advised me that he had dried, de-humified [sic] and cleaned the corrosion from the electronic board in an attempt to extract the data. Disappointingly, he was unable to extract any data. Jenkins informed me the only other possible avenue would be to conduct a screen/board swap from a new Garmin unit. This would come at a significant cost as the units were all the latest models, which I was informed would not be possible without a guarantee of results. I picked up the units on August 25, 2021 and transferred them into MEP evidence storage.

The best way to retrieve information from the chart plotters and Yamaha display after they have been submerged, according to Denver's expert, Steven Burgess ("Burgess"), is "to disconnect them from power, remove the devices from the boat, to *not* let them dry out, but rather to immediately submerge them in distilled water" (emphasis in original). This "keep[s] corrosion from affecting the internal memory components of the devices." The devices could then be submerged in 99% isopropyl alcohol and dried. These GPS devices, however, were unsubmerged and exposed to air from July 17, 2021 until at least July 27, 2021. Burgess stated that exposure to air would have likely hastened the degradation of the electronic components of these devices, especially if they had been exposed to salt water. Burgess expected that if the chart plotters and Yamaha display had been properly preserved he would have been able to recover the data from their internal memory storage.

Denver's other experts commented on the information that could have been obtained from the chart plotters. Specifically, Emond stated that it "can reasonably be expected" that the chart plotters recorded the boat's position and speed information prior to the accident. He additionally stated that the Yamaha Display is also capable of recording GPS data in the same manner as the chart plotters. Schofield further averred that if GPS data could have been obtained

7

from the chart plotters "this would have been the best evidence of course and speed at the time of impact."

### V. The Commonwealth's Evidence of Speed

The Commonwealth retained Wendy Sanders ("Sanders") from Explico, Inc. to opine about the speed of the boat at the time of the crash.  In her report, dated August 3, 2022, Sanders stated that she reviewed the MEP accident report, the "Yamaha Diagnostic System reports for subject outboard motors, dated July 27, 2021 [i.e., the ECU data]," photographs of the boat taken by the MEP,[6] the site itself, and a nine-second recording from a FLIR camera located at MassPort's Conley Terminal, .9 miles away from the accident.[7]

Based on this information, she concluded "to a reasonable degree of engineering and scientific probability," that:

1. The Denver Vessel impacted Channel Marker 5 Green, specifically its southern and eastern posts, with a Principal Direction of Force (PDOF) directed toward 12 o'clock.  The damage to the vessel is consistent with a head-on allision, such that the orientation of the damage does not indicate that the vessel was turning to port or to starboard at impact.

2. Analysis of vessel damage, impact alignment and surveillance video footage indicate that the Denver vessel was likely traveling approximately 47 mph at the time of the allision.  Surveillance camera matching and vessel tracking calculated a speed of approximately 46 mph.

3. The data downloaded from the three Engine Control Units (ECUs) indicated that the RPMs for all three motors was 5500 rpm at the time of the allision.  This is noted in Pursuit DC365 product literature to correlate to a vessel speed of 49.2 mph.[8]

4. The analysis of vessel damage, impact alignment, surveillance video footage

---

[6] It is unclear when the pictures upon which Sanders relies were taken in relation to the July 27, 2021 execution of the search warrant where "[a]ttempts were made to cut fiberglass and utilize hydraulic jacks to access" the forward berthing area.
[7] Sanders did not examine the boat itself, because it had been destroyed.
[8] Sanders stated that she received this information, which the Commonwealth has acknowledged is incorrect, from Sergeant Ahlborg.

and camera matching and tracking techniques indicates that the impact speed was
consistent with the recorded ECU data and product specifications.

5. The analysis of vessel damage, impact alignment, surveillance video footage
and camera matching and tracking techniques indicates that the vessel was not
operating at a low or moderate speed at the time of the allision.

6. The entirety of the available evidence indicates that this was a high-speed
allision event, and that the vessel was traveling at 46-49 mph at the time of the
allision.

## DISCUSSION

The Commonwealth has a duty to preserve exculpatory evidence for the defendant to

inspect, perform tests on, or examine.  See *Commonwealth* v. *Harwood*, 432 Mass. 290, 295

(2000).  To obtain a remedy for the Commonwealth's destruction or loss of or failure to preserve

evidence, the defendant "has the initial burden of establishing a reasonable possibility, based on

concrete evidence and not on mere speculation, that the Commonwealth's actions deprived him

of evidence that would have been favorable to his case." *Commonwealth* v. *Olszewski*, 416

Mass. 707, 714 (1993); *Commonwealth* v. *Heath*, 89 Mass. App. Ct. 328, 334 (2016) (defendant

must "articulate what exculpatory information he believes the evidence would have revealed, and

there must be a 'reasonable possibility' that the evidence could have revealed such exculpatory

information prior to its loss or destruction"); *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15,

20-21 (1993) (quotations and citations omitted) (defendant "need not show conclusively the

exculpatory nature of the destroyed evidence but, rather, must establish a reasonable possibility,

based on concrete evidence rather than a fertile imagination, that access to the [destroyed

material] would have" been exculpatory).[9]

---

[9] "If a defendant is unable to meet this threshold burden, he may be independently entitled to a
remedy of exclusion if the loss or destruction of evidence was due to the bad faith or reckless
acts of the Commonwealth." *Commonwealth* v. *Sanford*, 460 Mass. 441, 447 (2011) (quotations
and citation omitted).  "In such a case, the judge may infer properly the exculpatory nature of the

9

If the defendant establishes that the Commonwealth has destroyed potentially exculpatory evidence, then the court must consider the appropriateness and extent of remedial action to ensure the defendant's right to a fair trial. See *Commonwealth* v. *DiBenedetto*, 427 Mass. 414, 419 (1998). In determining the appropriateness and extent of the remedy, the court balances the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant from loss of the evidence. See *Olszewski*, 416 Mass. at 716. If remedial action is required, the court has discretion concerning the manner in which to protect the defendant's rights. *Commonwealth* v. *Henderson*, 411 Mass. 309, 310 (1991). While in some circumstances, the proper remedy is dismissal of the indictment, "[a]bsent egregious misconduct or at least a serious threat of prejudice, the remedy of dismissal infringes too severely on the public interest of bringing guilty persons to justice." *Sasville*, 35 Mass. App. Ct. at 28 (quotations and citation omitted).

### I. Reasonable Possibility that Evidence was Exculpatory

The Commonwealth argues that Denver has not shown that the lost and destroyed evidence was exculpatory. The Court disagrees.

First, one of the boat's passengers recorded a cellphone video depicting the boat's wake approximately ninety seconds prior to the crash. Schofield, one of Denver's experts, found that the boat's wake pattern was "sufficiently distinctive" for him to "duplicate" it, using "an exemplar boat, of identical model, and ballasted with salt bags to match the passenger weight ... at the time of the accident." When he did this, the wake pattern of his test boat "matched the video pattern at 2500 rpm engine speed, which makes for 11 miles per hour in that particular

---

destroyed evidence, in essence shifting to the Commonwealth the burden to show that the lost or destroyed evidence was not exculpatory." *Id.*

loading condition of the boat."

In addition, police interviews of the surviving passengers, shortly after the crash, indicate that the boat was not travelling at an excessive rate of speed when it crashed.  For example, on July 17, 2021, when asked about the speed of the boat when it crashed, Mussa Kassa told police: "I mean, we weren't going like crazy, crazy or anything like that," and Zouk Mo ("Mo") responded: "Nautical miles, I don't know.  It felt like, I don't know, 20, 30."  On August 5, 2021 at another interview, the police asked Mo:  "Did it seem to you like you were moving fast ....?"  Mo responded, "Not slow."  When asked if the speed was "hold on" fast he responded:  "No, no, no, no, no.  You could be on your feet without holding on to anything and be fine.... That kind of speed."  On July 28, 2021, Matthew Postal stated they were, "in the harbor just putting around.  I know there was a couple of parts, we were moving pretty fast. ...  As far as speed, all different variations ....  I wouldn't say that there was any part that I can remember that we were wide open ... I know we'll do 50, I think we're doing 50, absolutely not because I think I would have been in the hospital with them ..."  Not one passenger interviewed by police stated that Denver was speeding and any passenger asked about excessive speed rejected claims that Denver was speeding.  In addition, the only passenger asked about speed before the grand jury, Pierre Joas, testified that the boat "[s]ure as hell wasn't going fast to the point, because I would not feel comfortable if that was the case, because I'm not a big boat or water person."

This evidence supports Denver's contention that he was not operating the boat at an excessive rate of speed at the time of the incident.  As to what exculpatory information the lost and destroyed evidence would have revealed, Schofield averred that GPS data from the chart plotters "would have been the best evidence of course and speed at the time of impact."  Indeed, Sergeant Ahlborg testified before the grand jury that the chart plotters "likely would have shown

11

the GPS path with specific speeds" and "would have given speed, specific reference points."

Further, Schofield stated that he cannot reach a scientific opinion about speed through standard

accident reconstruction methods without the boat. If he had been able to examine the boat itself,

he might have been able to show that Denver was not speeding. Finally, without access to the

original ECU data, Emond cannot confirm that the Commonwealth's process was conducted

properly or that the data is accurate and complete.

The Court concludes that Denver has shown a reasonable possibility that the GPS data

from the chart plotters, the data from the ECUs, and the boat itself could have revealed

exculpatory information as to the speed of the boat at the time of the accident. Having concluded

as such, the Court turns to the remedy for the lost and destroyed evidence.

## II. Remedy

As stated earlier, in determining the appropriateness and extent of the remedy, the court

considers the culpability of the Commonwealth, the materiality of the evidence, and the potential

prejudice to the defendant. See *Olszewski*, 416 Mass. at 716-717.

### A. Culpability of the Commonwealth

There is no evidence that the Commonwealth acted in bad faith or recklessly here. See

*Commonwealth* v. *Thompson*, 2021 Mass. App. Unpub. LEXIS 740 *9 (2021) (to show

recklessness there needs to be evidence as to state of mind of persons who made decisions

regarding evidence). Instead, it seems that through carelessness that was negligent or grossly

negligent and inadvertence, the Commonwealth lost or destroyed the relevant evidence. In the

balancing process, "the Commonwealth is considered culpable if the evidence has been lost or

destroyed through its inadvertence or negligence." *Commonwealth* v. *Kee*, 449 Mass. 550, 554

(2007); see also *Commonwealth* v. *Noonan*, 48 Mass. App. Ct. 356, 360 n.5 (1999) ("Negligence

12

or inadvertence are less culpable than bad faith, but they are nevertheless culpable and must be accounted for in the balancing procedure.").

### B. Materiality of the Evidence

"Evidence is material if, in considering the entire record, it creates a reasonable doubt as to the defendant's guilt that would not otherwise exist." *Commonwealth* v. *Otsuki*, 411 Mass. 218, 231 (1991). Denver's experts have detailed how the three pieces of evidence are material to Denver's attempt to show that he was not travelling at an excessive rate of speed at the time of the accident. Before the grand jury, the Commonwealth heavily relied on Denver's alleged excessive rate of speed; the Court presumes that it plans to do so at trial also.

#### 1. Chart Plotters and Yamaha Display

It cannot be genuinely disputed that the GPS data from the chart plotters and Yamaha Display is material. Denver's experts have stated that the chart plotters could provide the most reliable evidence of the boat's speed at the time of the crash and Sergeant Ahlborg testified before the grand jury that the chart plotters "would have given speed, specific reference points." Thus, information from the chart plotters and Yamaha display could have shown that Denver was not speeding, which might create a reasonable doubt as to the defendant's guilt that would not otherwise exist.

#### 2. The Boat

Schofield has described the material evidence that he would have used from the boat itself to reconstruct the accident, including the speed of the boat. The Commonwealth's destruction of the boat destroyed Schofield's ability to develop evidence that might create a reasonable doubt that Denver was speeding.

13

### 3. ECU Data

Emond stated that because of the destruction of the Yamaha engines in the fire, he cannot confirm whether the ECU data McLaughlin retrieved was accurate and comprehensive. Although Emond also opined that ECU data cannot be used by itself to validly determine the speed of the engine or the boat, the Commonwealth relied on the ECU data before the grand jury, indicating that the evidence is material to the Commonwealth's case. Thus, evidence that could be determined by Edmond, such as whether the extraction was done correctly, all pertinent information was extracted, and the data analysis done by McLaughlin is accurate, would also be material.

### C. Potential Prejudice to the Defendant

In considering the potential prejudice to the defendant, the court inquires "whether access to the missing item would have aided in the defendant's case." *Kee*, 449 Mass. at 554. The Court concludes that the potential evidence that could have been obtained from the chart plotters and Yamaha display, the boat itself, and the ECUs would have aided Denver in his defense against the Commonwealth's evidence of speed. Thus, the loss of these items prejudices Denver's ability to defend himself in any case in which the Commonwealth seeks to introduce evidence that his boat was travelling at an excessive speed at the time of the collision.

The Court, however, will not dismiss the indictments as requested by Denver. The Court concludes that dismissal is too draconian a remedy. The Commonwealth's conduct here was careless, negligent, or grossly negligent, but not so "egregious" that the public's interest in bringing a guilty person to justice should be infringed if other untainted evidence is sufficient to convict. *Sasville*, 35 Mass. App. Ct. at 28. Further, while Denver is prejudiced by the loss of evidence, the harm to him is not "irremediable." *Id.* There is an adequate remedy for the

14

Commonwealth's transgressions here, that is, not allowing the Commonwealth to introduce evidence at trial that the boat was travelling at an excessive speed.[10]  This remedy is adequate because the lost and destroyed evidence was potentially relevant to the boat's speed at the time of the collision.  The evidence is not relevant to the Commonwealth's other theories of the case, such as whether Denver was under the influence of alcohol, strayed away from the boat's steering wheel, or failed to dim the boat's cabin lights.

**ORDER**

For the foregoing reasons, it is hereby **ORDERED** that the Defendant's motion to dismiss the indictments is **DENIED**.  The Commonwealth, however, is precluded from introducing evidence at trial that the boat was travelling at an excessive speed.

Robert L. Ullmann
Justice of the Superior Court

Dated: February 2, 2023

---

[10] Excluding evidence of the boat's excessive speed may dramatically weaken the Commonwealth's case, but the Commonwealth's own careless actions make exclusion of this evidence a necessary remedy.